Nathaniel N. Peckham (Bar No. 302197)
DEREK SMITH LAW GROUP, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103
Telephone: (215) 391-4790
Facsimile: (215) 893-5288
nathaniel@dereksmithlaw.com

Attorneys for Plaintiff
Tashiana Luke

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TASHIANA LUKE,

               Plaintiff,

        v.

DOUGH BOY, INC.; LANGSTON
FAIZON SANTISIMA a/k/a
FAIZON ANDRE LOVE,
Individually,

             Defendants.

_____

CASE NO. 2:18-cv-07456-ODW-GJS

**PLAINTIFF'S APPENDIX OF
EVIDENCE IN OPPOSITION
OF MOTION FOR
SUMMARY JUDGMENT**

Date: December 16, 2019
Time: 1:30 PM
Ctrm: 5D (First Street Courthouse)
Judge:       Hon. Otis D. Wright

Action Filed:       08/24/2018
Trial Date:       03/20/2020

# TABLE OF CONTENTS

**DEPOSITIONS**                                                    **PAGE(S)**

**Exhibit 1:**   Deposition of Tashiana Luke, Experts from

transcript Dated August 6, 2019 ………………….   1-13

**Exhibit 2:**   Deposition of Faizon Love, Experts from

transcript dated November 20, 2019………………   14-25

**DECLARATIONS:**

**Exhibit 3**:   Declaration of Tashiana Luke…………………….   26-29

**Exhibit 5**:   Declaration of Nathaniel Peckham, Esquire………   34-36

**DOCUMENTS:**

**Exhibit 4:**   Text Messages, July 3, 2016………………..……..   30-33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

1

Nathaniel N. Peckham (Bar No. 302197)

2

DEREK SMITH LAW GROUP, PLLC
1835 Market Street, Suite 2950

3

Philadelphia, PA 19103

4

Telephone: (215) 391-4790
Facsimile: (215) 893-5288

5

nathaniel@dereksmithlaw.com

6

7

Attorneys for Plaintiff
Tashiana Luke

8

9

UNITED STATES DISTRICT COURT

10

CENTRAL DISTRICT OF CALIFORNIA

11

12

TASHIANA LUKE,

13

|        CASE NO. 2:18-cv-07456-ODW-GJS

14

            Plaintiff,        |

15

        v.                    |
DOUGH BOY, INC.; LANGSTON     |   **DEPOSITION OF**

16

FAIZON SANTISIMA a/k/a        |   **TASHIANA LUKE**

17

FAIZON ANDRE LOVE,            |
Individually,                 |

18

                              |   Date:  December 16, 2019

19

            Defendants.       |   Time: 1:30 PM
                              |   Ctrm: 5D (First Street Courthouse)

20

                              |   Judge:       Hon. Otis D. Wright
                              |

21

                              |

22

                              |
                              |   Action Filed:      08/24/2018

23

                              |   Trial Date:       03/20/2020

24

——————————————————————|

25

26

27

28

2

ORIGINAL

# In the Matter Of:

## LUKE vs DOUGH BOY

2:18-cv-07456-ODW-GJS

---

# TASHIANA LUKE

*August 06, 2019*

---



800.211.DEPO (3376)
EsquireSolutions.com

3

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   TASHIANA LUKE,

 5
                  Plaintiff,
 6

 7             vs.                    Case No.
                                      2:18-cv-07456-ODW-
 8   DOUGH BOY, INC.; LANGSTON        GJS
     FAIZON SANTISMA a/k/a FAIZON
 9   ANDRE LOVE, individually,

10

11               Defendants.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
12

13

14        VIDEOTAPED DEPOSITION OF TASHIANA LUKE

15

16              TUESDAY, AUGUST 6, 2019

17                    9:50 A.M.

18

19        6300 WILSHIRE BOULEVARD, SUITE 1415

20              LOS ANGELES, CALIFORNIA

21

22

23

24

25   Reported by Megan M. Grossman-Sinclair, CSR 12586
```



TASHIANA LUKE
LUKE vs DOUGH BOY

August 06, 2019
133

```
 1              A.    We were just going to write the
 2    scene.
 3              Q.    And what was the scene to entail?
 4              A.    Just Faizon having parody sex and
 5    we needed to do -- we hadn't done casting yet.
 6              Q.    So you understood the parody would
 7    include nudity?
 8              A.    No.
 9              Q.    You said it would include
10    Faizon having -- a parody having sex.
11              A.    Yes, but that doesn't -- a parody
12    is not real.  So a parody is something that's
13    supposed to be overexaggerated of something.  So
14    him shooting a parody of porn, it would be like
15    them doing porn but it would be overly exaggerated
16    and you can tell that it's not real.  Like it
17    shouldn't look like it's real porn.
18              Q.    But you understand pornography
19    includes nudity?
20              A.    But parodies --
21              Q.    That's not what I'm asking.
22              A.    But we weren't shooting porn --
23              Q.    You understand pornographic films
24    include nudity; correct?
25              A.    Yes.
```



1          Q.   And a parody is making fun of or          12:19:5

2   exaggerating that thing; right?                       12:19:5

3          A.   Yes.                                       12:19:5

4          Q.   And it was your understanding that,       12:19:5

5   albeit, it was a parody of a pornographic film, it    12:20:0

6   would not include nudity?                             12:20:0

7          A.   I -- it was my understanding it           12:20:0

8   wouldn't include actual porn.                         12:20:0

9          Q.   What do you call "actual porn"?           12:20:1

10         A.   The video he sent me.                      12:20:1

11         Q.   You understood that the parody            12:20:1

12  would involve Mr. Love in sexual situations?          12:20:1

13         A.   I don't -- understand him actually        12:20:2

14  receiving sexual pleasures.                           12:20:2

15         Q.   Okay.  Listen -- listen to my             12:20:2

16  question and please answer that one.  I am not        12:20:2

17  here to argue the point with you.                     12:20:3

18         A.   Well, I am not arguing.                    12:20:3

19         Q.   I just want you to answer my              12:20:3

20  specific question.  So if you could read that         12:20:3

21  back, please?                                         12:20:4

22         (Record read as follows:                        12:20:4

23         "QUESTION:  You understood that the            12:20:4

24         parody would involve Mr. Love in               12:20:4

25         sexual situations.")                           12:20:4



1        THE WITNESS:  Ish, yeah.                    12:20:4

2   BY MR. BENT:                                     12:20:4

3        Q.   What do you mean by "ish"?             12:20:4

4        A.   Like, I don't recall his dick being    12:20:4

5   in somebody's mouth.  Like, I don't think that   12:20:4

6   that should happen in a parody because that's real  12:20:5

7   porn.                                            12:20:5

8        Q.   Did he tell you what scenes would      12:20:5

9   be included in the parody?                       12:20:5

10       A.   We hadn't -- I hadn't written          12:21:0

11  anything.                                        12:21:0

12       Q.   I am asking you during that -- the     12:21:0

13  Roscoe conversation, did he tell you what type of  12:21:0

14  scenes would be included in the parody?          12:21:0

15       A.   No.  He just wanted -- he just let     12:21:0

16  me know he wanted it to be very funny.           12:21:1

17       Q.   Did you ask him what scenes would      12:21:1

18  be included?                                     12:21:1

19       A.   I was supposed to think on it.         12:21:1

20       Q.   My question is:  Did you ask him?      12:21:1

21       A.   I was doing the writing of it --       12:21:2

22       Q.   I understand that.  Did you ask him    12:21:2

23  what kind of scenes would be included at Roscoe's  12:21:2

24  in the parody?                                   12:21:2

25       A.   No.                                    12:21:2



TASHIANA LUKE
LUKE vs DOUGH BOY

August 06, 2019
139

```
 1              A.    Because he shot this on his cell           12:24:
 2    phone and it's in slow motion and a woman is going         12:24:
 3    up and down on his penis.  So that's porn.  And he         12:24:
 4    should not have sent that to my phone.                     12:24:
 5              Q.    How do you know it was shot with            12:24:
 6    his cell phone?                                            12:24:
 7              A.    You can see that it was shot on his         12:24:
 8    cell phone video.                                          12:24:4
 9              Q.    Were you present when it was               12:24:4
10    shot --                                                    12:24:4
11              A.    No, but you can tell.                       12:24:4
12              Q.    How can you tell it -- it was --           12:24:4
13              A.    Have you seen the video?                    12:24:4
14              Q.    Let me finish.  I'm not gonna              12:24:4
15    answer the questions.  Okay?  How do you know from         12:24:4
16    viewing a video that it was shot with a cell phone         12:24:4
17    as opposed to some cheap beta camera?                      12:24:5
18              A.    But have you seen the video?                12:24:5
19              Q.    I have seen the video.                      12:24:5
20              A.    Okay.  So I just wanted to make            12:24:5
21    sure that before I had continue to answer.  So you         12:24:5
22    saw the video.  He -- it could be a cheap ass              12:25:0
23    camera that he shot it on, but it wasn't.  And I          12:25:0
24    am also his -- at the time, was also his personal         12:25:0
25    assistant.  So if he had done a test scene, I             12:25:1
```

```
 1    would have been privy to the test scene because I        12:25:1

 2    would have set that test scene up for him,               12:25:1

 3    and -- and these text messages, it states we             12:25:2

 4    hadn't done casting yet.  Which we already -- we          12:25:2

 5    had a conversation about doing the casting before        12:25:2

 6    he sent me this video because the casting still          12:25:2

 7    needed to be done.                                       12:25:3

 8            Q.   You were his assistant; correct?            12:25:3

 9            A.   Yes.                                         12:25:3

10            Q.   He didn't need your permission to           12:25:3

11    start the casting without you; right?                    12:25:4

12            A.   No, but as the assistant, that              12:25:4

13    would've been under the -- under my job title.  I        12:25:4

14    would have handled it.  He wouldn't have.                12:25:4

15            MR. BENT:  Move to strike                        12:25:5

16    everything after the "no" as nonresponsive.              12:25:5

17    BY MR. BENT:                                             12:25:5

18            Q.   Mr. Love would be in charge of the          12:25:5

19    project; correct?                                        12:25:5

20            A.   Yes.                                         12:25:5

21            Q.   And as a writer you would be                12:25:5

22    subordinate to his position; right?                      12:26:0

23            A.   Yes.                                         12:26:0

24            Q.   So if he felt like doing casting           12:26:0

25    without you, he wouldn't need your approval;             12:26:0
```



```
 1            A.    If I am your daughter --                          12:29:1

 2            Q.    Let me finish -- let me finish --                 12:29:1

 3            A.     No, because you're playing in my                 12:29:1

 4    face, like you're playing in my face.  If I'm your              12:29:1

 5    daughter and Faizon sent me this video, is this --              12:29:1

 6    is this part of my job or not?  If I am your kid                12:29:2

 7    and he sends me this video, is this a part of my                12:29:2

 8    job?  Should I expect him to send a woman giving                12:29:2

 9    him oral sex to my phone as your daughter?                      12:29:3

10            Q.    Okay.  I am not here to answer --                 12:29:3

11            A.    But I just want to know for myself.               12:29:3

12    So that we can go -- because if that's the type                 12:29:3

13    the shit that you-all do out here --                            12:29:3

14            MR. PECKHAM:  Off the record --                         12:29:3

15            THE WITNESS:  -- then that's just                       12:29:3

16    what you-all do--                                               12:29:4

17            MR. PECKHAM:  Let's go off the                          12:29:4

18    record.                                                         12:29:4

19            THE WITNESS:  Like you can clearly                      12:29:4

20    see that this is not a test scene.  This is not a               12:29:4

21    parody.  This is him sending me a video of him                  12:29:4

22    receiving oral sex in slow motion.                              12:29:4

23            MR. BENT:  With --                                      12:29:5

24            MR. PECKHAM:  Let's go off the                          12:29:5

25    record for a few minutes.                                       12:29:5
```



TASHIANA LUKE
LUKE vs DOUGH BOY

August 06, 2019
154

```
 1    you spoken to any other former employees of          01:29:0

 2    Mr. Love?                                             01:29:0

 3              A.    No.                                    01:29:0

 4              Q.    How about Dough Boy?                   01:29:0

 5              A.    No.                                    01:29:0

 6              Q.    Did you undergo any type of            01:29:0

 7    training when you started working for either Dough    01:29:1

 8    Boy or Mr. Love?                                      01:29:2

 9              A.    Just our phone conversations.         01:29:2

10              Q.    During the time that you worked for   01:29:2

11    Dough Boy and/or Mr. Love, did you observe him        01:29:3

12    engage in any type of sexual acts or sexual           01:29:3

13    comments towards other individuals?                   01:29:4

14              A.    No.                                    01:29:4

15              Q.    Ever see him touch anybody during     01:29:4

16    your employment in a manner that you felt was         01:29:5

17    inappropriate?                                        01:29:5

18              A.    No.                                    01:29:5

19              Q.    Do you know if the video that he      01:29:5

20    sent you on June 25th was sent to other               01:29:5

21    individuals?                                          01:30:0

22              A.    No.                                    01:30:0

23              THE COURT REPORTER:  Can I

24    interrupt for a second?  This is the Exhibit -- I

25    want both of you to be aware of -- that she's --
```



TASHIANA LUKE
LUKE vs DOUGH BOY

August 06, 2019
158

```
 1              Q.    And describe for me how you felt          01:33:3
 2   when you saw the video?                                    01:33:4
 3              A.    Disgusted.                                 01:33:4
 4              Q.    Why?                                       01:33:4
 5              A.    Because why would he send it to my        01:33:4
 6   phone?                                                      01:33:4
 7              Q.    What was it about what was in the         01:33:4
 8   video that disgusted you?                                  01:33:5
 9              A.    He had no business sending                01:33:5
10   something like that to my phone.                           01:33:5
11              Q.    My question is:  What about what          01:33:5
12   you saw --                                                 01:34:0
13              A.    The fact that he had no business         01:34:0
14   sending such a video to my phone.  And it                  01:34:0
15   disgusted me.  I was, like -- like, I was furious          01:34:0
16   that he thought so little of me to send me a video         01:34:1
17   like that.                                                 01:34:1
18              Q.    Prior to this day, had you ever           01:34:1
19   viewed any pornographic films?                             01:34:1
20              A.    Yes.                                       01:34:2
21              Q.    Were you offended by what was             01:34:2
22   depicted?                                                  01:34:2
23              A.    No.                                        01:34:2
24              Q.    On how many occasions had you             01:34:2
25   viewed pornographic films prior to --                      01:34:2
```



1    the porn -- him shoot -- by being a porn star.      02:18:22

2         Q.   The fat guy being a porn star?            02:18:22

3         A.   Yeah, but it wasn't supposed to be        02:18:22

4    actual porn.                                        02:18:30

5         Q.   But I am trying to understand why         02:18:33

6    you came to that belief.                            02:18:33

7         A.   Because of what we discussed about        02:18:34

8    shooting the video, about shooting a parody of      02:18:38

9    porn.  So if we are shooting a parody of porn, we   02:18:43

10   wouldn't be shooting actual porn because it's       02:18:45

11   supposed to be a parody of it.                      02:18:45

12        So we -- you do a parody of                    02:18:48

13   something, you don't exactly do exactly what the    02:18:47

14   other, like, what's going on.  We were just going   02:18:51

15   to be dramatizing the scene of a porno.  So we      02:18:54

16   should have had everything in the scene that you    02:18:57

17   would have to shoot porn, but we should not be      02:18:57

18   actually shooting porn.                             02:19:00

19        Q.   Is that a conclusion that you came        02:19:00

20   to on your own or somebody has explained to you     02:19:00

21   that a parody of a porno would not include actual   02:19:11

22   sex?                                                02:19:11

23        A.   It shouldn't have included actual         02:19:11

24   sex.  I didn't -- I don't think that I am just      02:19:11

25   coming to this assumption.  I feel -- I mean, I am  02:19:11



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

Nathaniel N. Peckham (Bar No. 302197)
DEREK SMITH LAW GROUP, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103
Telephone: (215) 391-4790
Facsimile: (215) 893-5288
nathaniel@dereksmithlaw.com

Attorneys for Plaintiff
Tashiana Luke

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASHIANA LUKE, | CASE NO. 2:18-cv-07456-ODW-GJS |
| Plaintiff, | |
| v. | |
| DOUGH BOY, INC.; LANGSTON FAIZON SANTISIMA a/k/a FAIZON ANDRE LOVE, Individually, | **DEPOSITION OF FAIZON LOVE** |
| Defendants. | Date: December 16, 2019<br>Time: 1:30 PM<br>Ctrm: 5D (First Street Courthouse)<br>Judge: Hon. Otis D. Wright |
| | Action Filed: 08/24/2018<br>Trial Date: 03/20/2020 |

Case 2:18-cv-07456-ODW-GJS  Document 26-3  Filed 11/25/19  Page 18 of 38  Page ID #:261

Deposition of Faizon Love       TASHIANA LUKE vs. DOUGH BOY, INC.; and LANGSTON FAIZON SANTISIMA

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

    TASHIANA LUKE,                    )

4                               )

            Plaintiff,          )

5                               )

    VS.                             )

6                               ) Case No.

    DOUGH BOY, INC.; and LANGSTON     ) 2:18-cv-07456-ODW-GJS

7     FAIZON SANTISIMA, a.k.a. FAIZON     )

    A. LOVE, individually,          )

8                               )

            Defendants.         )

9     _____ )

10

11

12            DEPOSITION OF FAIZON A. LOVE

13            Wednesday, November 20, 2019

14              Los Angeles, California

15

16

17

18

19

20

21     REPORTED BY:

22     GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR

23     FILE NO.: 2882

24

25

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

    TASHIANA LUKE,                    )
 4                                    )
              Plaintiff,              )
 5                                    )
    VS.                               )
 6                                    ) Case No.
    DOUGH BOY, INC.; and LANGSTON     ) 2:18-cv-07456-ODW-GJS
 7  FAIZON SANTISIMA, a.k.a. FAIZON   )
    A. LOVE, individually,            )
 8                                    )
              Defendants.             )
 9  _____ )

10

11

12

13

14           Deposition of FAIZON A. LOVE

15  taken on behalf of Plaintiff, at 145 South Fairfax

16  Avenue, Suite 200, Los Angeles, California,

17  beginning at 9:03 a.m. and ending at 12:06 p.m., on

18  Wednesday, November 20, 2019, before GRACE CHUNG,

19  CSR No. 6246, RMR, CRR, CLR.

20

21

22

23

24

25
```

1   Q.   And what was your role on that show?

2   A.   Cast.

3   Q.   And did the show end in 2016, or did you

4   just leave the show at that point, if you know?

5   A.   The show ended in 2016.

6   Q.   And while you were a cast member of the

7   Real Husbands of Hollywood show, did anyone working

8   on that show ever accuse you of sexual harassment?

9   A.   No.

10   Q.   Do you recall working with a woman named

11   Brittany Johnson on that show?

12   A.   Yes.

13   Q.   And did Ms. Johnson ever accuse you of

14   sexual harassment?

15   A.   No.

16   Q.   And did you ever send a picture of your

17   genitalia to Ms. Johnson?

18   A.   Yes.

19   Q.   Did she request that you do so?

20   A.   I sent it to her boss, which is my boss,

21   Craig --

22   Q.   Did -- I'm sorry.  Please continue.  I

23   didn't mean to interrupt?

24   A.   Carl Craig.

25   Q.   And Mr. Craig was involved with the Real

1   Husbands of Hollywood show?

2          A.   He's a producer.

3          Q.   Just to clarify, you testified that

4   Mr. Craig was your boss and Ms. Johnson's boss?

5          A.   Yes.

6          Q.   And what was the reason for sending the

7   photo to Mr. Craig?

8          A.   It was a joke.  That was the nature of the

9   set.  It was the nature of the set, to tell crude

10  jokes on there.  We were a bunch of comedians, so I

11  can't remember exactly what it was, but he asked me

12  to do something, and I said, "Tell him this."

13         Q.   Can you clarify what you mean by you said,

14  "Tell him this"?

15         A.   He asked me to -- I can't remember what he

16  actually asked me to do, but that was my way of

17  telling him no but really yes.

18              I can't explain it to you.  It's a comedian

19  thing.  We have known each other for over 20 years,

20  so we -- we have that relationship.

21         Q.   So just to make sure I'm fully

22  understanding, in an attempt to tell Mr. Craig a no

23  but really yes, you sent him a photo of your

24  genitals?

25         A.   Yes.

1      Q.   How did he respond?

2      A.   He laughed, but -- he laughed.  He said,

3  "Very funny, but inappropriate."

4      Q.   Did you feel it was inappropriate to do

5  that?

6      A.   No.  Actually, no.

7      Q.   Were you confused by his response?

8      A.   Yes.

9      Q.   Do you think he overreacted?

10     A.   No, because he was laughing.  I can't --

11  he was laughing and telling me that at the same

12  time.  So he's laughing and telling me that's -- I

13  understand it's inappropriate, but that's -- but,

14  you know -- I can't explain it; it's a comedian

15  thing.

16     Q.   And how did Ms. Johnson end up receiving

17  the picture in this instance?

18     A.   She was texting me something he was

19  saying.  He was -- he was talking to her.  A lot of

20  times, the assistant is with the person they're

21  working for, and she was saying, "Hey, can you do

22  this, hey, can you do that."

23        I'm like, "No."

24        "Can you do this?"

25        "No.  Well, you tell him I said this."  And

1   that was the response from me.

2        Q.   So was the photo sent to Ms. Johnson's

3   phone or Mr. Craig's phone?

4        A.   Ms. Johnson's phone.

5        Q.   Do you know if she then passed it on to

6   Mr. Craig?

7        A.   She definitely did.

8        Q.   And did Ms. Johnson say anything directly

9   to you about the photo?

10       A.   No.

11       Q.   After you sent this photo to Mr. Craig,

12   did you receive any kind of discipline for doing

13   so?

14       A.   No.

15       Q.   Other than Mr. Craig mentioning it was

16   inappropriate, did he have any other conversation

17   with you about the picture?

18       A.   He said, "She's not one of us.  Not cool."

19   You know, "She's not one of us.  Not cool."  But,

20   you know, "Don't ever do it again."

21       Q.   "She" as in Brittany Johnson?

22       A.   Yes, yes.

23       Q.   And when you say "one of us," are you

24   referring to comedians or some other group?

25       A.   Family group.  I mean, we all know each

```
 1    other for years.  That's why we were doing the

 2    television show.  The show wasn't put together by

 3    an agency; it was put together by us.  Kevin Hart,

 4    Chris Spencer, Carl Craig, Jesse Collins.  We have

 5    all known each other over 30 years.  We have all

 6    slept on each other's couches and -- you know, that

 7    type of thing.

 8        Q.   So other than that instance that we just

 9    discussed where you sent that photo to Mr. Craig

10    via Ms. Johnson, did you send a photo of your

11    genitals to anyone else working for Real Husbands

12    of Hollywood?

13        A.   Yes.

14        Q.   Who else did you send it to?

15        A.   Chris Spencer.

16        Q.   The last name one more time.

17        A.   Spencer.

18        Q.   Was Mr. Spencer also a producer or --

19        A.   Yes.

20        Q.   -- or a different role?

21        A.   Yeah, he's a producer.

22        Q.   Was that photo sent directly to Mr.

23    Spencer or also through an assistant?

24        A.   Directly to his phone.

25        Q.   Is that the same picture you sent
```

1      A.   It probably was censored -- sorry.  Are

2   you finished?

3      Q.   Was it censored or uncensored when shown

4   on television, if you know?

5           MR. BENT:  Vague and ambiguous.

6   BY MR. PECKHAM:

7      Q.   If you are able to answer.

8      A.   Was it censored?  I don't know what you

9   are saying.

10      Q.   When someone would watch the show on

11   whatever channel, TV channel that it was on, would

12   they see nudity or would they see censored nudity,

13   if that makes more sense?

14      A.   What's "censored nudity"?

15      Q.   For example, nudity, say, with a black box

16   or something placed over the image so as to not

17   show the actual nudity.

18      A.   That depends on BET, when they show it.

19   Shown at a certain time, they would show whatever.

20   Shown before a certain time, they would censor it.

21      Q.   Understood.  So other than the photos we

22   discussed that were sent to Carl Craig and Chris

23   Spencer, did you send photos of your penis to

24   anyone else on Real Husbands of Hollywood?

25      A.   Kevin Hart.

1    Q.   How many times did you send the photo of

2   your penis to Mr. Hart?

3    A.   Once.  Maybe once.

4    Q.   And what was your reason for doing so?

5    A.   I told him he was being a dick.

6    Q.   Are you talking about separately, or was

7   the photo meant to communicate that he was being a

8   dick, in your words?

9    A.   No.  I said, "You are being" a picture, in

10   my picture.

11    Q.   And how did he respond, if you recall?

12    A.   Laughed.

13    Q.   Did Mr. Hart ever send you a photo of his

14   genitals?

15    A.   No.

16    Q.   Did Mr. Craig ever do so?

17    A.   Yes, but not on the show.

18    Q.   That was another time?

19    A.   Yes.

20    Q.   Do you recall approximately when that was?

21    A.   We were working on a project in Kentucky,

22   and it was a horrible project, and one of the --

23   one of the scenes were about at a strip club or

24   something, and -- I can't recall.  I mean, it was

25   in Kentucky at this horrible project we were doing.

 1    We were just making fun of it; like, there is

 2    nothing else.  He was just -- yeah.

 3         Q.   And did Mr. Spencer ever send you a

 4    picture of his genitals?

 5         A.   No.

 6         Q.   Other than Mr. Craig, Mr. Spencer, and

 7    Mr. Hart, did you send a photo of your genitals to

 8    anyone else on the Real Husbands of Hollywood show?

 9         A.   No.

10         Q.   Did you work with Raquel Lee on that show

11    at any point?

12         A.   I don't know who that is.

13         Q.   Other than Mr. Craig's response about the

14    picture being inappropriate, did anyone else ever

15    tell you sending a picture of your penis was

16    inappropriate at the Real Husbands of Hollywood

17    show?

18         A.   No.

19         Q.   Did you ever feel concerned that it was

20    inappropriate to do so?

21         A.   No.  It was the culture.  It was the

22    culture.

23         Q.   When you say "it was the culture," were

24    there other people who were also sending pictures

25    of their genitals to other people that you were

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

Nathaniel N. Peckham (Bar No. 302197)
DEREK SMITH LAW GROUP, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103
Telephone: (215) 391-4790
Facsimile: (215) 893-5288
nathaniel@dereksmithlaw.com

Attorneys for Plaintiff
Tashiana Luke

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASHIANA LUKE,<br><br>                    Plaintiff,<br><br>          v.<br>DOUGH BOY, INC.; LANGSTON<br>FAIZON SANTISIMA a/k/a<br>FAIZON ANDRE LOVE,<br>Individually,<br><br>                    Defendants. | CASE NO. 2:18-cv-07456-ODW-GJS<br><br>**DECLARATION OF PLAINTIFF**<br><br><br>Date:  December 16, 2019<br>Time: 1:30 PM<br>Ctrm: 5D (First Street Courthouse)<br>Judge:      Hon. Otis D. Wright<br><br><br>Action Filed:      08/24/2018<br>Trial Date:        03/20/2020 |

# **DECLARATION**

I, Tashiana Luke, hereby declare as follows:

1.      I have personal knowledge of each of the matters set forth below and, if called as a witness, could and would testify competently to each of them under oath.

2.      I am over 18 years old and reside in the Commonwealth of Pennsylvania.

3.      This declaration is submitted in opposition to Defendants Faizon Love and Assembly Robot, Inc.'s (collectively, "Defendants") Motion for Summary Judgment or, in the alternative, Motion for Partial Summary Judgment ("Motion") against Plaintiff Tashiana Luke.

4.      I am the Plaintiff in this action.

5.      On June 25, 2016, Defendant Faizon Love sent me a pornographic video via text message to my cell phone.

6.      I am unaware of whether Defendant Love sent the video discussed immediately above in paragraph 5 to anybody else.

7.      While I had discussed working with Defendant Love on his pornography parody project, we had not discussed shooting any "test scenes" at the time that he sent me the video.

8.      Defendant Love had not discussed sending me any "test scenes" prior to sending me the video.

9.      It was my understanding that the porn parody would not include any actual sexual intercourse in the video.

10.      As Defendant Love's assistant, I believed that I would be involved in setting up any "test scenes" for the parody project.

11.     When Defendant Love sent me the video, we had not completed any casting work for the parody.

12.     I was shocked and disgusted upon viewing the video of oral sex that Defendant Love sent me.

13.     Based on my conversations with Defendant Love prior to his sending me the video, it was clear to me that this video was far beyond anything contemplated or communicated to me regarding the parody.

14.     I felt violated and sexually harassed as a result of Defendant Love sending me the pornographic video.

15.     I felt even further harassed because Defendant Love had previously made sexual comments towards me, including that "your ass looks good in those jeans."

16.     I also felt that Defendant Love would stare at me inappropriately at times prior to his sending the video to me.

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.  Executed this ____ day of November, 2019 at Philadelphia, Pennsylvania.

*Tashiana Luke*

Tashiana Luke

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 4

Nathaniel N. Peckham (Bar No. 302197)
DEREK SMITH LAW GROUP, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103
Telephone: (215) 391-4790
Facsimile: (215) 893-5288
nathaniel@dereksmithlaw.com

Attorneys for Plaintiff
Tashiana Luke

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASHIANA LUKE, | |
| Plaintiff, | CASE NO. 2:18-cv-07456-ODW-GJS |
| v. | |
| DOUGH BOY, INC.; LANGSTON FAIZON SANTISIMA a/k/a FAIZON ANDRE LOVE, Individually, | **TEXT MESSAGES** |
| Defendants. | Date: December 16, 2019 |
| | Time: 1:30 PM |
| | Ctrm: 5D (First Street Courthouse) |
| | Judge: Hon. Otis D. Wright |
| | |
| | Action Filed: 08/24/2018 |
| | Trial Date: 03/20/2020 |

31

**Fazion Love, +13107...**



It never got coffee

Fazion Love

Fazion I'm not the regular people you go back and forth with. So you can try ya bull shit with me. And we don't have to do this on the phone via text like I said I'm in the lobby I can air ya dumb ass in person. You a weird old ass creep who apparently likes to send unwarranted picture's of your penis to young woman three of whom work on the set of rhoh. Which  I will be happy to bring to the attention of BET and JSR hr if you don't stop playing in my face

Brent fuck this bitch I'm done

Fazion Love





32

10



**Fazion Love, +13107...**

> Brent fuck this bitch I'm done

Fazion Love

Who would trust you to get coffee? A full cup would never make it to the recipient@

> You better have a hella squad in philly because I got one in the 60s lets go Brent I'm show this monkey bitch who the devil is

Fazion Love

Fat ass you don't want that problem. Brent go on enjoy ya holiday.  I'm off this. Keep ya stack.

7/3/16 1:07 AM



Type a message...



33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 5

Nathaniel N. Peckham (Bar No. 302197)
DEREK SMITH LAW GROUP, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103
Telephone: (215) 391-4790
Facsimile: (215) 893-5288
nathaniel@dereksmithlaw.com

Attorneys for Plaintiff
Tashiana Luke

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TASHIANA LUKE, | | |
| | | CASE NO. 2:18-cv-07456-ODW-GJS |
| Plaintiff, | | |
| v. | | |
| DOUGH BOY, INC.; LANGSTON | | **DECLARATION OF** |
| FAIZON SANTISIMA a/k/a | | **NATHANIEL PECKHAM** |
| FAIZON ANDRE LOVE, | | |
| Individually, | | |
| | | Date:  December 16, 2019 |
| Defendants. | | Time: 1:30 PM |
| | | Ctrm: 5D (First Street Courthouse) |
| | | Judge:     Hon. Otis D. Wright |
| | | |
| | | Action Filed:     08/24/2018 |
| | | Trial Date:     03/20/2020 |

35

# **DECLARATION**

I, Nathaniel Peckham, declare as follows:

1.      I have personal knowledge of each of the matters set forth below and, if called as a witness, could and would testify competently to each of them under oath.

2.      I am an attorney at law licensed to practice in the State of California. I am an associate with the Derek Smith Law Group, attorneys for Plaintiff, Tashiana Luke in this matter.

3.      This declaration is submitted in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

4.      The opposition is made following the conference of counsel pursuant to Local Rule 7-3, which took place on October 2, 2019, and Defendants subsequent Motion for Summary Judgment.

5.      I took the deposition of Defendant, Faizon Love, on November 20, 2019, at the office of Bent, Caryl & Kroll, LLP, in Los Angeles, California. Attached to Plaintiff's Appendix of Evidence in Support of Motion ("Appendix of Evidence") as Exhibit 2 are true and correct copies of experts from the deposition of Faizon Love, dated November 20, 2019.

6.      Attached to Plaintiff's Appendix of Evidence as Exhibit 1 is a true and correct copy of Plaintiff's deposition, dated August 6, 2019.

7.      Attached to Plaintiff's Appendix of Evidence as Exhibit 4 is a true and correct copy of text messages dated July 3, 2016.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 25th day of November, 2019, at Philadelphia, Pennsylvania.

/s/ *Nathaniel N. Peckham*, Esq.
Nathaniel N. Peckham, Esq.